**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

|  |  |
|---|---|
| YESCARE CORP., | : |
| Plaintiff, | : CASE NO. _____ |
| v. | : |
|  | : **COMPLAINT** |
| MARQUIS SOFTWARE | : |
| DEVELOPMENT, INC., ABC | : **(Jury Trial Demanded)** |
| COMPANY, and JOHN DOES 1-5, | : |
|  | : |
| Defendants. | : |

Plaintiff, YesCare Corp., ("YesCare") a provider of healthcare to incarcerated individuals, by and through its undersigned attorneys, brings this action for damages and injunctive relief against Defendant, Marquis Software Development, Inc., ("Marquis"), ABC Company, and John Does 1-5, and alleges with knowledge respecting its own actions and otherwise upon information and belief, as follows:

**<u>INTRODUCTION</u>**

This case involves broken promises by Marquis to keep YesCare's valuable confidential information and trade secrets confidential. Instead, Marquis leveraged YesCare's confidential information and trade secrets to negotiate a sale of software containing that information to a YesCare competitor, ABC Company. This is particularly devastating and causes irreparable harm because a competitor's only reasons for negotiating a purchase of the software at issue is to: (i) steal YesCare's

confidential information and trade secrets; and/or (ii) lock YesCare out of the software so YesCare (as well as correctional facilities and offenders) can no longer access the protected health information added to the software by YesCare. This is an existential threat to the continued existence of YesCare. This also affects more than 26,000 offenders in 38 facilities in eight states. Moreover, this jeopardizes the health, safety, and welfare of the offenders. Further, it exposes 38 correctional facilities (with already constrained budgets) to potential lawsuits by a myriad of inmates who cannot receive adequate healthcare on an informed basis as their protected health information may likely become inaccessible for a period of months. The natural result of 38 correctional facilities' exposure to inmate lawsuits further taxes the already busy dockets of judicial systems in these eight states – including Florida.

## PARTIES

1.     Plaintiff, YesCare Corp., is a Texas corporation with its principal place of business at 205 Powell Place, Brentwood, Tennessee 37027 ("YesCare").

2.     Defendant, Marquis Software Development, Inc., is a Florida corporation with its principal place of business at 1625 Summit Lake Drive, Suite 105, Tallahassee, Florida 32317 ("Marquis").

3.     Defendant ABC Company is an unknown entity with whom Defendant, Marquis, has negotiated a sale of the eOMIS Software which is the subject of this

dispute. Plaintiff expects to discover the identity of this entity through discovery. In this Complaint, ABC Company is occasionally also referred to as the "Buyer."

4. Defendants John Does 1-5 are individuals affiliated with Defendant, ABC Company who directed and participated in, the intentional tort of tortious interference perpetrated by Defendant ABC Corp.

## JURISDICTION AND VENUE

5. Plaintiff brings this action to recover damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief.

6. Subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367.

7. This Court has original jurisdiction over Plaintiff's cause of action for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.

8. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to YesCare's claims against the Defendants occurred in this judicial district.

9. Venue is appropriate in this district because Defendant's principal place of business is located in the district and an agreement between the parties specifies any disputes shall be subject to the exclusive jurisdiction of the courts of Florida.

## FACTUAL ALLEGATIONS

3

10.     YesCare and its affiliates are in the business of providing offender healthcare services, including health care staff, programs, and protocols, for a number of state and local correctional agencies across the United States providing healthcare services to tens of thousands of incarcerated individuals.

11.     Marquis is engaged in the business of developing and licensing computer software for correctional systems, including eOMIS®, an electronic medical record system ("eOMIS" or "Software").

12.     On January 1, 2023, Marquis and YesCare entered into the "eOMIS EHR SaaS Agreement" (the "Agreement") pursuant to which Marquis would provide YesCare access to an electronic health record ("EHR") management platform using the eOMIS Software. (*See* January 1, 2023 Agreement attached hereto as **Exhibit A**.)

13.    eOMIS was created with "YesCare Content,"[1] "YesCare Confidential Information,"[2] and "Correctional Agency Data,"[3] as defined in the Agreement, as well as YesCare "proprietary information [and] functionality." (*See* **Exhibit A** at Clause 19.4.)

14.    "YesCare Content," "YesCare Confidential Information," "Correctional Agency Data," as defined in the Agreement, as well as YesCare "proprietary information [and] functionality" and processes known as "Workflows," in addition to YesCare's correctional agency contracts and the identity of YesCare physicians, nurses and others providing healthcare health care to offenders on behalf of YesCare, are referred to collectively as YesCare's "Trade Secrets."

---

[1] "*YesCare Content*" is defined as "YesCare created screen extensions, standard forms, and some agreed upon application metadata provided to Marquis by YesCare . . . during Set-Up or otherwise." (Agreement at Clause 3.4.) The Agreement further provides that "YesCare Content "is and shall remain the sole proprietary property of YesCare." (*Id.*)

[2] "*YesCare Confidential Information*" means: "(a) any information disclosed by or on behalf of YesCare to Marquis at any time before the termination of this Agreement (whether disclosed in writing, orally or otherwise) that at the time of disclosure (i) was marked as 'confidential'; or (ii) should have been reasonably understood by Marquis to be confidential; and (b) Correctional Agency Data[.]"(Agreement at Clause 1.1.)

[3] "*Correctional Agency Data*" means: "all data including metadata, works and materials: uploaded to or stored on the [EHR] Platform by YesCare or Direct Contracts; transmitted by the Platform at the instigation of YesCare or Direct Contracts; supplied by YesCare to Marquis for uploading to, transmission by or storage on the Platform; or generated by the [EHR] Platform as a result of the use of the Hosted Services by YesCare or Direct Contracts (but excluding analytics data relating to the use of the Platform and server log files[.]"(Agreement at Clause 1.1.)

15. The Agreement automatically renewed for a two-year term on February 1, 2025, pursuant to Clause 2.3.

16. YesCare uses eOMIS to chart and store electronic medical records, clinical menus, forms, order sets, and workflows, to provide cost-efficient, evidence-based medical care.

17. Accordingly, eOMIS contains significant amounts of confidential Protected Health Information ("PHI") governed by state and federal privacy laws, including the Health Insurance Portability and Accountability Act (commonly referred to as "HIPAA") which is protected from disclosure without prior patient consent.

18. Offender health care generally refers to the provision of medical, dental, and mental health services to individuals within the criminal justice system, encompassing those in prisons, jails, and those reentering the community after incarceration.

19. This specialized and data-driven industry is complicated by ethical and legal issues, limited resources, disruptions in care, substance abuse disorders, health disparities, and infectious diseases, among many other challenges.

20. For YesCare, eOMIS holds the state and federally protected confidential healthcare information for offenders, including offender medical history, vital signs history, chronic conditions, treatment plans, all prior encounters,

6

upcoming appointments and consultations, pending orders for medical care, medication management, immunizations, pharmacy, dental, behavioral, and more, for approximately 26,000 offenders living in 38 facilities across a number of states including Florida, Alabama, New Mexico, New Jersey, Kentucky, New York, and Michigan.

21.    YesCare accounts for approximately 90 percent of Marquis' business relating to eOmis.

22.    On or about May 6, 2025, YesCare became aware that Marquis intended to sell the eOMIS Software.

23.    In fact, YesCare learned in May that Marquis had been actively marketing the sale of eOMIS to software industry buyers since November 2024 without YesCare's knowledge.

24.    YesCare was surprised to learn eOMIS was for sale, but not surprised that there was no interest among software industry buyers.

25.    While eOMIS is a critical software program to YesCare, the coding is approximately 30 years old and outdated.

26.    As a result, it would be more expensive to purchase and then upgrade eOMIS because average modern coders are generally not familiar with the outdated code used in eOMIS. Updating the Software to a level consistent with modern

competing software platforms would conservatively cost approximately $5 to 10 million.

27.   Nonetheless, because eOMIS is critically valuable to YesCare's continuity of services, YesCare promptly offered to purchase the Software via a letter of intent sent to Marquis. (*See* May 6, 2025 Letter of Intent from YesCare to Marquis, attached hereto as **Exhibit B**.)

28.   Marquis did not respond to YesCare's offer set forth in **Exhibit B**.

29.   Subsequently, YesCare learned through providers and industry insiders that Marquis intends to sell the Software to a YesCare competitor or other buyer with a closing date of June 30, 2025.

30.   Despite repeated requests by YesCare to Marquis, YesCare has not been informed of the identity of the competitor to which Marquis intends to sell eOMIS.

31.   The conclusion that only a buyer or competitor of YesCare seeks to buy eOMIS to interfere with YesCare's business is understandable given the circumstances, which include the following:

   A.   eOMIS is outdated and updating it to be competitive with more modern software developed for similar purposes would be very expensive;

   B.   YesCare's payment of licensing fees for eOMIS, and associated services provided under the January 1, 2023 eOMIS EHR SaaS Agreement,

accounts for 90 percent of Marquis' annual business relating to the Software (*i.e.*, eOMIS is not widely used by others);

C.    eOMIS contains valuable YesCare confidential, proprietary and trade secret information, including YesCare's Workflows that would significantly aid a competitor in competing against YesCare if they were known;

D.    eOMIS contains the identities of all the doctors, nurses and other staff retained by YesCare at each facility which is not generally known or otherwise publicly available and would allow a competitor to understand the staffing levels necessary when participating in a competitive bidding process involving YesCare—particularly in facilities where YesCare currently provides its services; and

E.    eOMIS contains Confidential and protected medical histories and healthcare information, including HIPAA-protected information, for individuals and populations of offenders that can be viewed at an individual facility level, and then unfairly leveraged to compete against YesCare when participating in a competitive bidding process in which YesCare and a competitor are seeking to provide a winning proposal to provide health care services for a specific facility—particularly in a facility where YesCare currently provides its services.

32.    Indeed, the fact that Marquis has repeatedly refused to disclose any information to YesCare about the buyer of Marquis eOMIS software leads to the inescapable conclusion that the buyer is not purchasing a software product; rather, the buyer is purchasing access to YesCare's confidential data, proprietary Workflows, and trade secrets to use competitively against YesCare.

33.    The Letter of Intent sent to Marquis by Yes Care offered $1.5 million for eOMIS.  (*See* **Exhibit B**.) Because Marquis did not accept that offer, the amount paid by the Buyer is very likely more than $1.5 million. Businesses spending that amount of money perform due diligence to assure their investment will provide an adequate and positive return on their investment. With a concentrated revenue to one customer, it is clear a buyer is not purchasing eOMIS for the software—it is buying eOMIS to gain an unfair competitive advantage and would insist on specific due diligence concerning YesCare's use of eOMIS because YesCare accounts for 90 percent of the revenue that is generated by eOMIS. Therefore, it is conceivable to YesCare that Marquis has not already shared YesCare Confidential Information and YesCare's Trade Secrets with the buyer.

34.    Allowing a competitor to purchase YesCare's confidential data, proprietary Workflows, and Trade Secrets contained in the eOMIS software is an existential threat to YesCare's continued existence.

10

35.     A competitor of eOMIS could purchase eOMIS and shut down the Software the day after purchase, ending all YesCare access to the PHI of more than 26,000 offenders, irreparably harming (i) YesCare, (ii) the correctional facilities where eOMIS is used by YesCare, (iii) the offenders receiving healthcare through those facilities' contracts with YesCare; and (iv) the physicians, nurses, and other healthcare providers who rely on eOMIS to access the PHI for each of  those offenders.

36.     Alternatively, a buyer or competitor could keep the Software running, but data mine eOMIS for information relevant to every metric, contract, procedure, order set, workflow and protocol, enabling the competitor to undercut YesCare's current client contracts, methods of operations, and other confidential, proprietary information and systems belonging to YesCare.

37.     This would require YesCare to continue paying a monthly access fee (currently paid to Marquis) to a competitor in order to continue accessing its own data while YesCare's confidential client contracts, data, Trade Secrets, and patient care, are in jeopardy, while that competitor is causing YesCare irreparable harm. Knowing that Marquis is selling the eOMIS software to a competitor prompted YesCare to immediately contact Marquis to learn the identity of the buyer, seek reasonable assurances that the buyer was not a YesCare competitor, and to obtain

assurances that Marquis did not intend to breach the Agreement. (*See, e.g.,* June 18, 2025 YesCare letter to Marquis, attached hereto as **Exhibit C**.)

38.     YesCare received no substantive response to its June 18, 2025 letter to Marquis.

39.     On June 25, 2025, Jeff Sholey, YesCare's Chief Executive Officer advised Marquis' Chief Operating Officer, Larry Powell that Marquis would receive a letter from outside counsel outlining YesCare's concerns. (*See,* June 25, 2025 email, attached hereto as **Exhibit D**.)

40.     On June 25, 2025, Marquis' Chief Operating Officer, Larry Powell, finally responded with a text message directed to Jeff Sholey, YesCare's Chief Executive Officer. Mr. Powell's text message states, in part:

A.     "They [(*i.e.*, the buyer's representatives)] want to reach out to you [(*i.e.*, YesCare's representatives)] but don't feel comfortable doing so until they are under full contract with Marquis."

B.     "Contract negotiations are going well[.]"

C.     "I am hopeful we [(*i.e.*, Marquis and the buyer)] will be able to wrap things up [(*i.e.*, finalize the contract)] soon."

A copy of the June 25, 2025 text message from Marquis' Chief Operating Officer, Larry Powell, to Jeff Sholey is attached hereto as **Exhibit E**.

12

41. This June 25th text message confirmed that Marquis is negotiating with a buyer to sell eOMIS, contract negotiations are "going well," and the contract to sell eOMIS will be "wrap[ped] . . . up soon."

42. A sale of eOMIS to a competitor or any buyer without YesCare's knowledge, consent, or notice violates numerous provisions in the Agreement between YesCare and Marquis.

43. As a result, counsel for YesCare sent correspondence to Marquis outlining YesCare's substantial concern that Marquis is, or will shortly be, in material breach of the Agreement in connection with a sale or other assignment of eOMIS to any buyer—which would cause YesCare immediate, irreparable harm and substantial monetary and non-economic damages. (*See* correspondence dated June 25, 2025, attached hereto as **Exhibit F**.)

44. YesCare reiterated again in this June 25 correspondence that YesCare desired to know the buyer's identity. (*See* **Exhibit F**.)

45. In addition, YesCare demanded that Marquis provide reasonable written assurances that Marquis has not and will not breach the Agreement and that Marquis and/or the buyer state in writing how a potential transaction involving eOMIS will impact YesCare's use of the software going forward. (*See* **Exhibit F**.)

46. YesCare provided a deadline of 12:00 noon on Friday, June 27, 2025, at which time YesCare would be required to take all necessary legal action to enforce

its rights, including but not limited to, pursuit of injunctive relief, monetary damages, and any other remedies available at law or in equity.

47.    Jeff Sholey, YesCare's Chief Executive Officer also promptly responded to Mr. Powell's June 25, 2025 text that same day, referencing the letter from outside counsel and stating: "Thanks for responding Larry. Unfortunately, that doesn't really help us out here. I would think that any buyer that is truly trying to buy the business would be bending over backwards to communicate with the sole customer that makes up the vast majority of the business as opposed to letting uncertainty go unchecked." *See* **Exhibit G.**

48.    YesCare received no substantive response from Marquis. Instead, outside counsel for Marquis advised that additional time was needed to confer with Marquis the following week. Counsel purported that the transaction will not close without YesCare's consent. Additionally, Marquis' counsel continued her client's previous failures to provide reasonable assurances that YesCare Confidential Information and Trade Secrets had not already been shared with the buyer, despite numerous requests.

49.    Regardless, Marquis continues to seek to sell, transfer or otherwise convey eOMIS to a third-party buyer in violation of the Agreement, knowing the third-party buyer may shut down the eOMIS software and, thereby, YesCare's entire operations nationwide to extinguish YesCare as a competitor—leaving the

14

healthcare records of 26,000 individual's inaccessible to them and their healthcare providers for a period of time that may last a number of months.

50.    Marquis has knowingly disclosed YesCare's Trade Secrets, including "YesCare Confidential Information," "YesCare Content," YesCare's "Correctional Agency Data," as well as YesCare's "proprietary information and functionality," in violation of the Agreement and without YesCare's prior consent.

51.    Marquis is knowingly selling, transferring or otherwise conveying eOMIS to a buyer in violation of the Agreement, which will permit the buyer to mine eOMIS for YesCare's confidential, proprietary and trade secret data relevant to every metric, contract, procedure, workflow, order set, and protocol—thus enabling the buyer to unfairly compete with YesCare by, for example: (A) using such information (i) to offer more competitive pricing that undercuts YesCare's current client contracts, or (ii) to improve the buyer's efficiencies and thereby boost their profitability, and (B) potentially terminating YesCare's access to their confidential, proprietary and trade secret data with insufficient notice or opportunity to locate an equivalent EHR platform with adequate time to transfer that data—leaving the healthcare records of 26,000 individual's inaccessible to them and their healthcare providers for a period of time that may last a number of months.

52.    Even if the third-party buyer continues to operate eOMIS, YesCare will have to pay the monthly fee currently paid to Marquis in order to continue accessing

its own data while YesCare's client contracts, confidential data, proprietary information and materials, trade secrets, and patient care records, as well as YesCare's confidential and proprietary workflows and other business processes, are in jeopardy (*e.g.*, being mined by a competitor for purposes of unfair competition).

53.    Significantly, there is no indication this third-party buyer has received the authorizations necessary to be provided access to this confidential protected health information safeguarded by HIPPA.

54.    Marquis' actions threaten the continuity of medical care provided to 26,000 offenders throughout YesCare's substantial network of 38 correctional facilities in at least 8 states, as well as the confidentiality of those individuals' medical charts, medical history, treatment plans and more.

55.    Without the protections in the Agreement, YesCare confidential and proprietary information, processes, and Trade Secrets are unfairly exposed.

56.    As a result of Marquis' misconduct and willful breach of the Agreement and the consequences flowing directly therefrom, YesCare must migrate all of its eOMIS data and content to a different EHR platform, costing millions and requiring months of forensic computer work and coding, to avoid exposing (for example) YesCare Trade Secrets to a third-party or competitor—to the extent that information has not already been exposed.

57. All conditions precedent to the maintenance of this action have been performed, waived, or have otherwise occurred.

### COUNT I – BREACH OF CONTRACT
**(Against Marquis)**

58. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 54 as though set forth in full at this place.

59. YesCare and Marquis entered into a valid contract, including offer, acceptance, consideration, and sufficient specification of essential terms. (*See* **Exhibit A**.)

60. YesCare performed all its obligations under the Agreement.

61. Marquis materially failed to perform its obligations under the Agreement.

62. For example, the Agreement provides at Clause 21.1, that,

> Marquis must not assign, transfer, or otherwise deal with Marquis' contractual rights and/or obligations under this Agreement ***without the prior written consent of YesCare***, such consent not to be unreasonably withheld or delayed, providing that Marquis may assign the entirety of its rights and obligations under this Agreement to any Affiliate of Marquis or to any successor to all or a substantial part of the business of Marquis from time to time.

(*See* **Exhibit A** at Clause 21, emphasis added.)

63. Marquis has not sought, nor has YesCare provided, written consent to any transaction, assignment, or transfer of Marquis' contractual rights and/or obligations under the Agreement—despite repeated requests.

64.     In addition, Clause 3.4 provides that YesCare Content "is and shall remain the sole proprietary property of YesCare." More specifically, the Agreement states,

> . . . Marquis agrees that YesCare created screen extensions, standard forms, and some agreed upon application metadata provided to Marquis by YesCare ("YesCare Content") during Set-Up or otherwise is and shall remain the sole proprietary property of YesCare[.]

(*See* **Exhibit A** at Clause 3.4.)

65.     YesCare has not provided consent to Marquis selling, assigning, transferring, or dealing YesCare Content to any person or entity.

66.     To YesCare's knowledge, Marquis has taken no steps to ensure that YesCare Content is protected from disclosure or transfer as part of any contemplated transaction.

67.     Clause 8 of the Agreement grants Marquis a non-exclusive license to store, backup and export YesCare Correctional Agency Data as defined by the Agreement.

68.     YesCare has not provided any potential buyer of eOMIS with the licenses to YesCare Correctional Agency Data as described in Clause 8.

69.     Clause 12 of the Agreement sets forth Marquis' confidentiality obligations pursuant to which: "Marquis must . . . keep YesCare Confidential Information strictly confidential." (*See* **Exhibit A** at Clause 12.1(a).)

18

70.   Marquis is prohibited from disclosing "YesCare Confidential Information" "to any person without YesCare's prior consent, and then only under conditions of confidentiality approved in writing by YesCare." (*See* **Exhibit A** at Clause 12.1(b).)

71.   Marquis has not sought, nor has YesCare provided, consent under section 12 for disclosure to any person of the YesCare Confidential Information.

72.   YesCare does not (at this time) consent to the disclosure of any YesCare Confidential Information to any person or entity—in large part because Marquis refuses to identify the third-party buyer's identity and also refuses to provide reasonable assurances to YesCare.

73.   Further, under the express terms of the Agreement "Marquis must . . . act in good faith at all times in relation to YesCare Confidential Information" (*see* **Exhibit A** at Clause 12.1(d)) specifically including, but not limited to, only disclosing "YesCare Confidential Information to Marquis's officers, employees . . . and subcontractors who [(i)] have a need to access YesCare Confidential Information for the performance of their work with respect to this Agreement and [(ii)] *who are bound by a written agreement or professional obligation to protect the confidentiality of YesCare Confidential Information.*" (*Id.* at Clause 12.2, emphasis added.)

74. Marquis also owes YesCare an implied duty of good faith in the performance and enforcement of the Agreement with YesCare.

75. Marquis has failed to demonstrate good faith, or act with honesty in fact, and/or to observe reasonable commercial standards of fair dealing, with respect to its obligations owed to YesCare under the Agreement—whether those obligations are expressly stated in the Agreement or implied by the Agreement and all its attendant circumstances.

76. Marquis materially breached its express and implied contractual obligations of good faith and fair dealing when it acted to undermine the benefits YesCare is supposed to receive from the Agreement.

77. Specifically, Marquis has used the Agreement to gain an unfair advantage and deny YesCare the essence of the Agreement.

78. Moreover, Marquis has withheld crucial information from YesCare to YesCare's detriment.

79. Marquis' action and inactions, as described in part above, materially breached the Agreement.

80. Marquis' actions and inactions, as described herein, have caused YesCare damages.

81. As a direct result of Marquis' multiple breaches of the Agreement, YesCare has suffered and continues to suffer significant damages in an amount to

be proven at trial and reasonably believed to exceed $75,000, including but not limited to direct, indirect, consequential and special damages, as well as attorneys' fees.

**COUNT II – MISAPPROPRIATION OF TRADE SECRETS**
**In Violation of 18 U.S.C. § 1836(b), *et seq.*, Defend Trade Secret Act**
**In Violation of Fla. Stat. § 688.001-.009, Florida Uniform Trade Secrets Act**
**In Violation of Tex. Civ. Prac. & Rem. Code §§ 134A.001-.008, Texas Uniform Trade Secrets Act**
**In Violation of Tenn. Code §§ 47-25-1701, *et seq.*, Tennessee Uniform Trade Secrets Act**
**(Against Marquis, ABC Company, and John Does 1-5)**

82. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 78 as though set forth in full at this place.

83. YesCare spent millions of dollars developing and designing the processes and protocols which operate through the eOMIS system.

84. YesCare Trade Secrets constitute trade secrets under the Defend Trade Secrets Acts and the uniform Misappropriation of Trade Secrets Acts cited above.

85. YesCare developed these Trade Secrets over many years at substantial expense and they are highly valuable.

86. The Trade Secrets at issue each derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons or entities who can obtain economic value from their disclosure or use. Proof of this is demonstrated by Marquis not being able to sell the Software to another company that develops and licenses

21

computer software for correctional systems specifically, or EHR Platforms generally, and instead was only able to find a competitor of YesCare who wanted to purchase it because of the access it provides to YesCare's Trade Secrets and the ability to leverage those Trade Secrets to compete unfairly against YesCare.

87.    YesCare's Trade Secrets are the subject of reasonable efforts to protect the secrecy thereof and YesCare took reasonable steps to maintain the secrecy of its Trade Secrets at issue in this action.

88.    For example, in the Agreement at issue, YesCare included detailed section addressing "Marquis's confidentiality obligations" regarding its Trade Secrets (*see* Clause 12), as well as a warranty that Marquis would "incorporate security features reflecting the requirements of good industry practice" (*see* Clause 13.2(b)), and that upon termination of the Agreement, the contractual obligations of confidentiality owed by Marquis to YesCare would continue for an additional "period of 5 years" (*see* Clause 19.1 and Clause 12.5) and  guaranteeing that "Marquis shall remove any YesCare Content or YesCare proprietary information or functionality that are part of the Hosted Services offered by Marquis under th[e] Agreement." (*See* Clause 19.4.)

89.    Additionally, YesCare maintains an employee handbook entitled "Employee Success Guide: Your Guide to Success" that containing an "Acknowledgment Form" that must be signed annually by each employee stating

22

they have received the handbook and will become familiar with its contents. YesCare's employee handbook contains detailed policies and procedures, including confidentiality provisions, facility security provisions, network security provisions, and policies prohibiting the "[d]ownloading or transmitting [of] confidential information, such as trade secrets, proprietary information, business plans, private health information, items related to facility security or client information, without the express permission of management or the client, as appropriate."

90.    YesCare's employee handbook warns that "[r]evealing confidential Company or patient information" is an "[e]xample of misconduct" that serves as "grounds for immediate action and/or termination[.]"

91.    YesCare maintains a "Code of Conduct and Ethics." The Code of Conduct and Ethics contains sections addressing "Confidentiality," "Protection and Use of Company Property" including a subsection on the "Use of Technology." YesCare's Code of Conduct and Ethics contains a "certification and Agreement of Compliance" that must be signed by each employee and director of the company.

92.    Selected provisions of the YesCare Code of Conduct and Ethics addressing confidentiality provide as follows:

> **Confidentiality**
> *No employee may disclose confidential company or patient information to anyone except persons within the Company who need to know and have the appropriate authorization to receive such disclosures.* Confidential information includes all non-public information that might be of use to competitors, or harmful to the

Company, its patients or its customers, if disclosed. ***Information regarding a patient or former patient may not be released to third parties without written authorization, unless such a release is required or permitted by law.*** Company policy defines confidential patient information as individually identifiable health information that is transmitted electronically, maintained electronically, or transmitted or maintained in any other recorded form or medium (including oral and/or written).

(Code of Conduct and Ethics at v, emphasis added.)

### Information Concerning the Company's Business

Employees frequently have access to confidential information concerning the Company's business. Confidential information includes all non-public information that might be of use to competitors, or harmful to the Company or its customers, if disclosed. ***Safeguarding confidential information is essential to the conduct of the Company. Caution and discretion must be exercised in the use of such information, which should be shared only with those who have a clear and legitimate need and right to know.*** All of us should remember that outsiders may be listening to or watching us and may be able to pick up information they should not have. We should not, for example, discuss the Company's affairs in places where we can be overheard by others (such as corridors, the cafeteria, other restaurants, and on cellular phones) and we should be careful about how we handle and dispose of sensitive papers. ***Any unauthorized use or dissemination of business information may result in corrective action up to and including termination.***

***No employee may disclose confidential information of any type to anyone except persons within the Company who need to know.*** Information regarding a customer may not be released to third parties, government, or other organizations, without the consent of the customer unless required by law. Any requests for information arising through a legal process (e.g., subpoena or court order) must first be referred to the Chief Legal Officer before the release of the information.

(Code of Conduct and Ethics at 11, emphasis added.)

### Patient Confidentiality

24

Confidential patient information is defined as individually identifiable health information that is transmitted electronically, maintained electronically, or transmitted or maintained in any other recorded form or medium (including oral and/or written). As healthcare professionals, the Company's employees routinely possess and/or access sensitive, privileged information pertaining to patients in their care. ***In all cases patients have a legal right to, and properly expect that this sensitive information will be kept confidential and only utilized for legitimate and lawful purposes. As a health care provider, the Company takes its ethical, privacy, and security obligations (and any violation thereof) with regard to sensitive information very seriously. The Company's employees are expected to adhere to any and all applicable Company policies and/or procedures surrounding a patient's medical condition and/or the treatment he/she receives as a result thereof.*** In addition to potential violations of the Company's privacy and/or security policies, discussing sensitive information such as a patient's medical condition and/or disclosing sensitive information about a patient to anyone other than authorized Company personnel who need the information and/or other authorized persons (as permitted by law), is a violation of the Company's ethics policy and will have consequences.

***The Company also prohibits all unauthorized access to its information systems and/or any sensitive information maintained thereon. For this reason, the Company routinely monitors its systems so as to monitor access thereto and to preserve the integrity, confidentiality, and availability of the information contained thereon.*** Any individual who does not follow the applicable procedures for gaining access to the Company's information systems shall be deemed an unauthorized user and will be punished accordingly. The Company strictly prohibits any and all users from tampering with, destroying, and/or corrupting any of its data, in all forms (including electronic), and in all stored and/or transmitted capacities (e.g. at rest). Individuals who violate these rules will be prosecuted to the fullest extent of the law.

(Code of Conduct and Ethics at 11-12, emphasis added.)

25

93.     YesCare conducts annual online training of its employees in connection with its Code of Conduct and Ethics. The 2024 Code of Conduct and Ethics online training included:





26



94.    YesCare conducts annual online patient privacy training for employees addressing security concerns for PHI through its YesCare University training program. The "2024 Patient Privacy Annual Training" included the following:









95.    YesCare's Trade Secrets contained in eOMIS are used in, and intended for use in, interstate or foreign commerce.

96.    Prior to Marquis' misappropriation of YesCare's Trade Secrets, Marquis and YesCare entered into an Agreement specifically to protect YesCare Content and YesCare Confidential Information in the eOMIS software.

97.    The Agreement acknowledges that YesCare Content, and that the ownership of specific other content provided to Marquis, remains the property of YesCare.

98.    More specifically, Clause 3.4 of the Agreement states:

> Subject to any written agreement of the parties to the contrary, any Intellectual Property Rights that may arise out of the performance of the Set- Up Services by Marquis shall be the exclusive property of Marquis except Marquis agrees that YesCare created screen extensions, standard forms, and some agreed upon application metadata provided

to Marquis by YesCare ("YesCare Content") during Set-Up or otherwise *is and shall remain the sole proprietary property of YesCare* and Marquis will not incorporate such proprietary property in Marquis products offered to other entities. YesCare shall grant Marquis a limited, revocable, worldwide, non-exclusvie [sic], royalty free, non-assignable, [n]on-sublicensable license to use, distribute and publish YesCare Content during the term of this Agreement solely in the Hosted EHR. Subject solely to the limited license granted in this paragraph, YesCare expressly reserves all rights relating to the YesCare Content and *Marquis acquires no right, title, or interest* in or to the Corizon Content. For purposes of clarification, *the ownership of any pre-existing screen extensions, standard forms, and some agreed upon application metadata provided to Marquis by Corizon, for whom YesCare is the successor in interest, shall also reside with YesCare*.

(**Exhibit A**, Agreement at Clause 3.4, emphasis added.)

99.    Marquis is not authorized to assign YesCare Content or any of YesCare's Trade Secrets.

100.    According to the Agreement, "YesCare Confidential Information" means: (a) any information disclosed by or on behalf of YesCare to Marquis at any time before the termination of this Agreement (whether disclosed in writing, orally or otherwise) that at the time of disclosure (i) was marked as 'confidential'; or (ii) should have been reasonably understood by Marquis to be confidential; and (b) Correctional Agency Data." (**Exhibit A**, Agreement at Clause 1.1.)

101.    In addition, the Agreement specifically sets forth "Marquis's Confidentiality Obligations" as to YesCare Confidential Information at Clause 12.

102.    More specifically, according to Clause 12.1 of the Agreement:

Marquis must:

30

(a) keep YesCare Confidential Information strictly confidential;

(b) not disclose YesCare Confidential Information to any person without YesCare's prior written consent, and then only under conditions of confidentiality approved in writing by YesCare;

(c) use the same degree of care to protect the confidentiality of YesCare Confidential Information as Marquis uses to protect Marquis's own confidential
information of a similar nature, being at least a reasonable degree of care; and

(d) act in good faith at all times in relation to YesCare Confidential Information.

(**Exhibit A**, Agreement at Clause 12.1.)

103.    According to the Agreement, Marquis is required to obtain prior written consent of YesCare prior to disclosing any YesCare Confidential Information under conditions of confidentiality approved in writing by YesCare. (**Exhibit A**, Clause 12.1(b).)

104.    Marquis has not requested to disclose YesCare Confidential Information and YesCare has not provided prior written consent of any disclosure.

105.    YesCare's Trade Secrets had independent economic value as they were not generally known to other persons or businesses and could not be ascertained through proper means.

106.    YesCare's Trade Secrets were acquired by improper means. Alternatively, at the time of disclosure or use, Marquis, ABC Company and its officers and directors, John Does 1-5, knew that YesCare's Trade Secrets were (a)

31

derived from or through a person who had utilized improper means to acquire them; (b) acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; or (c) derived from or through a person who owed a duty to YesCare to maintain their secrecy or limit their use.

107. Defendants' conduct in this manner was both willful and malicious as Defendants are aware that YesCare Trade Secrets are the true target of acquisition, not the Software.

108. Marquis disclosed YesCare's Trade Secrets to, at minimum, ABC Company, and certain officers and/or directors of ABC Company, *i.e.*, John Does 1-5.

109. At the time of Marquis' disclosure to ABC Company, Marquis knew that YesCare's Trade Secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets and to limit the use of the Trade Secrets.

110. Defendants all knew the disclosure of YesCare's Trade Secrets was in contravention of Marquis' express duty to maintain YesCare's Trade Secrets as secret and confidential.

111. Defendants misappropriated YesCare's Trade Secrets by using and disclosing YesCare's Trade Secrets in contravention of the Agreement's requirement to maintain secrecy and confidentiality.

112. Defendants' misappropriation of YesCare's Trade Secrets was through improper means.

113. These improper means include disclosing and acquiring YesCare's Trade Secrets in violation of Marquis' express duties set forth in the Agreement.

114. Marquis' conduct positions the buyer, ABC Company and John Does 1-5, to unfairly compete with YesCare using YesCare's own information and Trade Secrets, to mine YesCare data using eOMIS to gain an unfair competitive advantage, and to tortiously interfere with YesCare's existing customer and patient relationships.

115. Defendants, ABC Company and John Does 1-5, conducted reasonable due diligence as part of the transaction/contract with Marquis and, therefore, possesses specific knowledge about the Agreement between YesCare and Marquis and its terms—particularly given that YesCare constitutes 90 percent of the revenue attributable to the Software it is purchasing.

116. Defendant, ABC Company, acquired YesCare's misappropriated Trade Secrets and continues to misappropriate YesCare's Trade Secrets.

117. Defendant, ABC Company, knowingly acquired YesCare's misappropriated Trade Secrets with the intent to leverage and use those Trade Secrets against YesCare.

33

118. The Defendants' conduct herein violated the Defend Trade Secrets Acts and the uniform Misappropriation of Trade Secrets Acts cited above and such violations were either knowing or willful.

119. As a direct and proximate result of Defendants' misappropriation of YesCare's Trade Secrets, YesCare has suffered and continues to suffer significant damages recoverable under the misappropriation of trade secrets statutes at issue, including direct, indirect, consequential, punitive, exemplary, and special damages in an amount to be proven at trial, as well as attorneys' fees and costs, and reasonably believed to exceed $75,000.

## COUNT III – ANTICIPATORY BREACH/REPUDIATION
### (Against Marquis)

120. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 116 as though set forth in full at this place.

121. The Agreement between YesCare and Marquis requires Marquis to provide YesCare notice and obtain YesCare's written consent prior to Marquis taking specific actions.

122. By failing to give YesCare actual notice of its intent to enter into an agreement to sell, transfer, or assign Marquis' obligations under the Agreement, Marquis has manifested the requisite intention *not* to perform under the contract.

34

123. By failing to seek or obtain YesCare's written consent to the sale, transfer, or assignment of Marquis' obligations under the Agreement, Marquis has manifested the requisite intention *not* to perform under the contract.

124. By disclosing YesCare's confidential, proprietary, and/or trade secret information without notice or YesCare's consent, Marquis has manifested the requisite intention *not* to perform under the contract.

125. Marquis' expressions of intent not to perform under the contract are positive and unequivocal.

126. YesCare was and is ready, willing, and able to perform and comply with its contractual obligations at the time of Marquis' repudiations under the Agreement.

127. YesCare made efforts to learn additional details about Marquis' apparent decision to sell eOMIS and made several attempts via written, telephonic, and text message communications to obtain information sufficient to assuage YesCare's concerns set forth herein.

128. YesCare encouraged Marquis via written, telephonic and text message communications to abide by the provisions of the Agreement requiring notice to YesCare and YesCare's consent.

129. As a direct and proximate result of Marquis' anticipatory breach and repudiation of its obligations under the Agreement, YesCare has suffered or will

suffer irreparable damage to its business, its reputation, and its goodwill, as well as loss of future business.

130. YesCare has suffered and continues to suffer significant damages, including direct, indirect, consequential, and special damages in an amount to be proven at trial and reasonably believed to exceed $75,000.

**COUNT IV – UNJUST ENRICHMENT**
**(In the alternative to YesCare's claim against Marquis for breach of contract)**
**(Against Marquis and ABC Company)**

131. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 127 as though set forth in full at this place.

132. eOMIS is valuable to a Marquis and ABC Company (the "Corporate Defendants") because of the investments YesCare has made and because it contains YesCare's confidential and proprietary data and Trade Secrets.

133. The Corporate Defendants benefitted from the substantial investments YesCare made into augmenting the eOMIS software.

134. Marquis knowingly accepted a benefit from eOMIS, knowing that the value in eOMIS is derived from the access it provides to YesCare's Trade Secrets and the ability to leverage those Trade Secrets to compete unfairly against YesCare.

135. Marquis has retained and/or used this benefit and under such circumstances it is unjust and inequitable for Marquis to retain the benefit conferred by YesCare.

36

136.   ABC Company has received YesCare confidential information through the due diligence process and has retained and/or used this confidential information to its benefit during negotiations with Marquis.

137.   Under such circumstances it is unjust and inequitable for ABC Company to retain the benefit conferred by YesCare.

138.   The Corporate Defendants have been unjustly enriched by the benefit derived from acquiring YesCare's Trade Secrets without being required to compensate YesCare.

139.   Marquis was conferred a benefit by using YesCare's confidential information and Trade Secrets as a material basis to secure the opportunity to negotiate a lucrative contract for the sale of eOMIS to ABC Company.

140.   ABC Company was indirectly and unwillingly conferred a benefit when Marquis' violated the terms of the Agreement and provided YesCare's confidential information and Trade Secrets to ABC Company when ABC Company was conducting its due diligence as part of the transaction.

141.   YesCare has suffered, and continues to suffer, significant damages, including direct, indirect, consequential, and special damages as a direct and proximate cause of the Corporate Defendants' conduct alleged above, in an amount to be proven at trial and reasonably believed to exceed $75,000.

**<u>COUNT V – PROMISSORY ESTOPPEL</u>**
**(In the alternative to YesCare's claim against Marquis for breach of contract)**

**(Against Marquis)**

142. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 138 as though set forth in full at this place.

143. Marquis made a clear and unambiguous promise to provide YesCare and, thereby, YesCare's offender patients a confidential, reliable and secure EHR system in eOMIS.

144. Marquis made a clear and unambiguous promise to give YesCare reasonable advance notice of any transfer, assignment, or other deal involving Marquis' obligations of confidentiality owed to YesCare.

145. Marquis made a clear and unambiguous promise to keep YesCare's confidential information confidential.

146. YesCare reasonably relied on Marquis' promises described above.

147. It was reasonable and foreseeable that YesCare would rely upon Marquis' promises described above.

148. YesCare further reasonably relied (to its detriment) on Marquis' promises by augmenting the eOMIS system through substantial financial investments and the sharing of YesCare's confidential and proprietary information and content with Marquis.

149. Marquis allowed YesCare to act with the expectation that Marquis' promises would be fulfilled, and then Marquis failed to live up to its promises.

150.  As a direct and proximate cause of Defendant Marquis' actions and material breaches of its promises as outlined in this Count, YesCare has suffered and continues to suffer significant damages, including direct, indirect, consequential, and special damages in an amount to be proven at trial and reasonably believed to exceed $75,000.

## COUNT VI – CONVERSION
### (Against Marquis and ABC Company)

151.  Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 147 as though set forth in full at this place.

152.  At all times material hereto, YesCare had all right, title and ownership of YesCare's confidential information which resided within eOMIS.

153.  Despite YesCare's ownership of this confidential information, Marquis knowingly, dishonestly, and intentionally marketed and capitalized on the sale of eOMIS, which would not exist without YesCare's confidential information which made eOMIS valuable.

154.  Despite YesCare's ownership of this confidential information, ABC Company, and John Does 1-5, knowingly and intentionally purchased eOMIS, with knowledge that it was valuable because it contains YesCare's confidential information.

39

155. ABC Company and John Does 1-5 purchased eOMIS with knowledge that Marquis did not have the authority to sell YesCare's Trade Secrets, which are included in the Software.

156. Marquis' sale of YesCare's confidential information constitutes a knowing, unlawful, and intentional conversion of YesCare's property for Marquis' benefit and to the economic detriment of YesCare.

157. ABC Company's purchase of YesCare's Trade Secrets constitutes a knowing, unlawful, and intentional conversion of YesCare property for ABC Company's benefit and to the economic detriment of YesCare.

158. Marquis and ABC Company have wrongfully asserted dominion over YesCare's property, inconsistent with YesCare's rights.

159. Marquis and ABC Company committed these wrongful acts with the intention to deprive YesCare of its property permanently or for an indefinite period of time.

160. YesCare has demanded that Marquis and ABC Company desist in their actions and Marquis and ABC Company have refused to return YesCare's property.

161. As a direct and proximate cause of Defendant Marquis and ABC Company's actions, YesCare has suffered and continues to suffer significant damages, including direct, indirect, consequential, and special damages in an amount to be proven at trial but which is reasonably believed to exceed $75,000.

## COUNT VII - TORTIOUS INTERFERENCE WITH EXISTING CONTRACT
### (Against ABC Company and John Does 1-5)

162. Plaintiff repeats and re-alleges allegations set forth in paragraphs 1 through 158 as though set forth in full at this place.

163. YesCare and Marquis are involved in an ongoing business relationship and contract as demonstrated by **Exhibit A**.

164. ABC Company is fully aware of the Agreement between YesCare and Marquis, as well as the existence of an ongoing business relationship between YesCare and Marquis, due to the due diligence ABC Company pursued as part of a contract it has with Marquis to purchase eOMIS.

165. Certain officers and directors of ABC Company, *i.e.*, John Does 1-5, are fully aware of the Agreement between YesCare and Marquis, as well as the existence of an ongoing business relationship between YesCare and Marquis.

166. ABC Company and John Does 1-5 intentionally and unjustifiably interfered with the contractual and ongoing business relationship between YesCare and Marquis.

167. ABC Company and John Does 1-5 intentionally induced and encouraged Marquis to breach its contract with YesCare to the benefit of ABC Company and to the detriment of YesCare.

41

168.    As a direct and proximate result of ABC Company and John Does 1-5's tortious interference with both the Agreement and YesCare and Marquis' ongoing business relationship, YesCare has suffered and continues to suffer significant damages in an amount to be proven at trial and reasonably believed to exceed $75,000.

**COUNT VIII – INJUNCTIVE RELIEF**
**(Against All Defendants)**

169.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 165 as though set forth in full at this place.

170.    YesCare has a substantial likelihood of success on the merits of the claims set forth herein.

171.    Defendants' unlawful conduct has and will continue to cause YesCare irreparable harm unless enjoined.

172.    YesCare faces irreparable harm in multiple forms. Defendants' conduct inappropriately exposes YesCare's Trade Secrets, including but not limited to YesCare's Confidential Information, YesCare Content, and Correctional Agency Data, in violation of various statutes prohibiting the misappropriation of trade secrets.

173.    The exposure of YesCare's confidential, proprietary and trade secret information, and data mining of eOMIS by ABC Company for that information, and immediate (or slow) erosion of YesCare from the marketplace due to Marquis'

knowing and willful actions, violates both state and Federal law, and jeopardizes the life, health, safety, and medical care of more than 26,000 offenders.

174. The injury to YesCare and YesCare's patients is not only irreparable but substantially outweighs any harm to Marquis that it might allege. Indeed, any harm to Marquis would be self-inflicted because its conduct violates both its agreement with YesCare and well-known laws concerning misappropriation of trade secrets.

175. Marquis and ABC Company may have to temporarily postpone a sale of the Software for a period of time. But Marquis cannot reasonably expect to avoid the consequences of its unlawful conduct by claiming it is somehow unfairly burdened by the requirement to comply with its contractual obligations to YesCare.

176. Granting injunctive relief to YesCare serves the public interest. A temporary restraining order and/or preliminary injunction in this case will serve the public interest, for example, by preserving the status quo for the 26,000 offenders receiving medical care through YesCare clients and the eOMIS EHR. The public interest in providing quality healthcare to incarcerated individuals is critical to overall public health, meeting ethical and legal obligations, and safety in reintegration.

177. Preserving the status quo also serves the public interest by upholding contractual obligations, denouncing anti-competitive business practices, protecting

a business's confidential information, protecting the fair and legitimate operations of the industry, and protecting consumers against deception and confusion.

178. As a result of Defendants' unlawful conduct, YesCare is entitled to a temporary restraining order and/or preliminary and permanent injunctive relief.

179. Pursuant to Fed. R. Civ. P. 65; 18 U.S.C. § 1836(b)(3); Fla. Stat. § 688.001-.009, Florida Uniform Trade Secrets Act; Tex. Civ. Prac. & Rem. Code §§ 134A.001-.008, Texas Uniform Trade Secrets Act; and Tenn. Code §§ 47-25-1701, *et seq.*, Tennessee Uniform Trade Secrets Act, YesCare is entitled to injunctive relief.

## PRAYER FOR RELIEF

180. To remedy the foregoing, Plaintiff requests the Court:

   (a) Enter an injunction enjoining Marquis from:

      (i) the unlawful conduct as alleged herein;

      (ii) breaching or continuing to breach the Agreement; and,

      (iii) closing any transaction with ABC Company in breach of the Agreement.

   (b) Enter an injunction to maintain the status quo for a period of twelve (12) months for YesCare to migrate all YesCare Trade Secrets, as well as its confidential and proprietary information, and patient data, to a new EHR platform;

(c)   Require ABC Company and John Does 1-5 return all Trade Secrets, confidential information and/or any other property of YesCare that may be in their possession, and certify that ABC Company and John Does 1-5 have destroyed or otherwise returned any residual data in their possession;

(d)   Award all damages, as applicable, in favor of the YesCare and against Marquis, including actual, direct, indirect, consequential, compensatory, punitive, exemplary, and special damages, in an amount to be proven at trial, including all pre-judgment interest thereon;

(e)   Award all damages, as applicable, in favor of the YesCare and against ABC Company and John Does 1-5, including actual, direct, indirect, consequential, compensatory and special damages, and punitive damages, in an amount to be proven at trial, including all pre-judgment interest thereon;

(f)   Award YesCare reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

(g)   Awarding YesCare all pre-judgment and post-judgment interest as allowed by law; and,

(h)   Any such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, YesCare, hereby demands a trial by jury on all issues so triable.


Respectfully submitted,

Dated: July 2, 2025          BOWMAN AND BROOKE LLP
                             *Attorneys for Plaintiff*
                             1064 Greenwood Boulevard, Suite 212
                             Lake Mary, Florida 32746-5419
                             Telephone: (407) 585-7600


                             By: */s/ Katherine A. Gannon*
                                 KATHERINE A. GANNON
                                 Florida Bar No. 056323
                                 Katie.Gannon@bowmanandbrooke.com

46